1
2
3
4
5
6
7

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

JEFFRY BREMER,                                    No. CIV S-09-2890-CMK

        Plaintiff,

    vs.                                              <u>MEMORANDUM OPINION AND ORDER</u>

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

_____/

      Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the written consent of all parties, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment. <u>See</u> 28 U.S.C. § 636(c). Pending before the court are plaintiff's motion for summary judgment (Doc. 15) and defendant's cross-motion for summary judgment (Doc. 18).

### I. PROCEDURAL HISTORY

      Plaintiff applied for social security benefits on November 8, 2005. In the application, plaintiff claims that his disability began on September 25, 2004. Plaintiff claims that his disability is caused by a combination of ruptured tendon on right arm, arthritis in entire body,

broken back, Hepatitis C, extreme pain in shoulders, and football size swelling in knees.  (CAR 122).  In his motion, plaintiff asserts a combination of conditions including chronic obstructive pulmonary disease (COPD), angioedema, pain in low back, knees, and hips, knee swelling, weakened strength in his right arm, and tendon injury in his right hand.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on March 10, 2008, before Administrative Law Judge ("ALJ") Mark C. Ramsey.  In a May 27, 2008, decision, the ALJ concluded that plaintiff is not disabled based on the following findings:

1. The claimant met the insured status requirements of the Social Security Act though December 31, 2004.

2. The claimant has not engaged in substantial gainful activity since September 25, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 404.971 *et seq.*).

3. The claimant has the following impairments which are severe in combination:  lumbar strain, history of right tendon injury, mild arthritis of the left shoulder, chronic obstructive pulmonary disease, and recurrent angioedema (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c).  Medium work involves lifting no more than 50 pounds occasionally or 25 pounds frequently.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 28, 1951 is currently 56 years old, which is defined as an individual of advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 25, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

After the Appeals Council declined review on August 17, 2009, this appeal followed.

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized below:

A.      Treating Records

The record contains treatment notes from 1996 through 2008.  In January 1996, plaintiff was admitted to the hospital for an upper gastrointestinal bleed, secondary to aspirin use. It was noted that he had a history of hepatitis C.

In June 1997, plaintiff had a motor nerve conduction study by Dr. Friend, noting a history of chronic low back pain and numbness.  The impression was: "The EMG for the right lower extremity was abnormal.  Chronic neuropathy is noted distally of the motor units for the common peroneal nerve distribution for the distal calf and the dorsal foot. . . . The motor nerve conduction study for the right peroneal nerve when compared to the left does show a delay of the distal latency along with minor slowing of the calf conduction velocity. . . . The H reflexes for the S1 nerves are within normal limits." (CAR 275).

In August 2000, an x-ray of plaintiff's shoulder found mild arthritis in the neck.

Plaintiff was seen in the Placer County Medical Clinic in April 2003, with a request for state disability forms to be filled out.  As plaintiff had not been seen there in five years, Dr. Ralli required him to schedule an appointment to be seen before the forms would be filled out. Dr. Ralli noted plaintiff was disheveled, with a belligerent affect, who had "no trouble getting up and down out of the chair nor any impairment in his gait." (CAR 272).  He then had a follow up

appointment for a sinus infection and difficulty sleeping.  In May 2003, plaintiff was seen for back

pain.  It was noted he had decreased range of motion in his spine and some tenderness.  Plaintiff

had another follow up in June, with the notes indicating he was unsuccessful in obtaining

disability so he was returning to work.  His range of motion in his neck was noted as okay.

Plaintiff was seen several more times in 2003 for sinus problems.

        In January 2004, plaintiff was seen again for sinus congestion and arm injury.

Examination of his arm revealed less muscle strength, noted at perhaps 4/5, especially with the

flexion maneuver.  The assessment was probable rupture of bicipital aponeurosis ligament.  (CAR

263).  Plaintiff was again seen several times in 2004 for sinus issues.  In May (presumably of

2004) Dr. Allen authored an assessment relating to plaintiff's recovery from surgery to repair his

tendon.  Dr Allen stated:

>           Mr. Bremer underwent repair of a ruptured right biceps tendon
>           3/15/04.  His original injury was Dec. 19, 2003.  Because of the
>           delay in treatment, he required a donor tendon for repair.  He will
>           need until approximately Jan. 15, 2005 for proper rehabilitation.  I
>           don't expect gainful employment as a laborer until after that time."
>           (CAR 249).

        In May 2006, plaintiff was seen in the emergency room twice for swelling of the

face and voice change as well as swollen lip, thought to be an allergic reaction.  It was noted that

plaintiff takes no medication except Motrin/ibuprofen periodically.  In October 2006, he was seen

in the emergency room again for hand laceration following a fall.  It was noted he had a tendon

laceration and was referred to orthopedist.  He then underwent surgery for repair of the right hand,

with a diagnosis of flexor tendon laceration.  Also in October, as part of the pre-op overview, a

chest x-ray found plaintiff had chronic obstructive pulmonary disease.  (CAR 217).

        Plaintiff continued to be seen for sinus issues in 2007.  In May 2007, plaintiff was

seen for sinus issues and pain.  It was noted he had a history of chronic back pain, DJD, hepatitis

C, asthma and chronic sinusitis.  Plaintiff reported headaches secondary to chronic sinusitis for

which he requested pain medication.  He also reported pain in his body, including his feet and

hands,  which he thought was caused by the hepatitis C.  Upon examination, his range of motion

in the lumbar spine was somewhat decreased with flexion and extension because of the pain, he

had minimal tenderness in the upper and lower spinal region, his deep tendon reflexes were

normal, he had no difficulty getting on or off the examination table, and his gait was normal.

Plaintiff was offered a prescription for Vicodin, but he refused to sign a pain management contract

and baseline urine drug test.  He left the office without the prescription.  (CAR 257).  In June

2007, plaintiff had a sinus CT.  In July, he was seen for inflamation in both legs.  In October, he

was seen for an allergic reaction.  In November 2007, it was determined that his allergic reaction

was recurring angioedema likely caused from nonsteroidal anti-inflammatory drugs which were

discontinued.  He was given a prescription for Tylenol and Vicodin.  (CAR 254).

Plaintiff had a follow up visit in January 2008 for a refill on his Vicodin and

intestinal pain.

B.     Consultative Examination Records

Internal Medicine Evaluation (Dr. J. O'Brien)

Plaintiff submitted to a medical evaluation on February 7, 2006.  Plaintiff reported

his chief complaints included:  1) Low back pain;  2) Neck symptoms;  3) Bilateral shoulder

problems;  4) Knee problem; and  5) Hepatitis C.  His only medication at that time was ibuprofen.

He reported constant pain in the lumbosacral area, which worsens with lifting and doing any

work.  As to his neck, he reported difficulty in looking up or down at times.  He reported soreness

in his shoulders, with a constant aching pain and decreased range of motion.  This improves with

ibuprofen.  He reported that his knees will bother him if he has a job involving kneeling.  Finally,

he reported the hepatitis C makes him tired and weak, with occasional nausea, but he has not had

any treatment for this.  As for his daily activities, he reported an ability to work for only three to

four hours per day, and decreased strength.  He reported doing some cooking, housekeeping, and

shopping, but that his mother does most of that.  He stated he takes care of his mother's property

and does repairs as needed.

Upon examination, the consultative examiner (CE) Dr. O'Brien noted plaintiff had no guarding with moving about, no difficulty walking, sitting, getting onto the examination table, or removing his socks and boots.  His neck was supple; no JVD.  His back showed normal lumbar lordosis and thoracic kyphosis; no evidence of scoliosis.  He had normal muscle bulk and tone. His knees were without crepitus bilaterally.  He had no difficulty squatting and rising.  His range of motion was normal throughout, except a slight decrease in flexion in his elbows, hips, and knees.  His straight leg raises were negative for pain, except on the left in supine position he had low back pain without radiation.  He had normal strength throughout, and normal reflexes.  He had two positive Waddell's signs: simulated rotation and distracted straight leg raise.  No diagnostic tests were completed.  Dr. O'Brien noted the following diagnoses:  1) Low back pain without evidence of radiculopathy;  2) Bilateral shoulder pain consistent with degenerative joint disease; 3) Bilateral knee symptoms with kneeling;  4) Hepatitis C per claimant history, without history of treatment.  Dr. O'Brien's assessment, based on the objective findings, include:  1) Ability to stand and walk for six hours in an eight hour workday;  2) Ability to ambulate as needed, including walking a block over rough or uneven surfaces, use of public transportation, and climbing a few steps with use of a handrail;  3) Sit for six hours in an eight hour workday;  4) Lift and carry 50 pounds frequently and 100 pounds occasionally;  5) Able to stoop, crouch, kneel, and climb six hours in an eight hour day;  6) Able to reach, handle, grasp, feel, and finger without limitation bilaterally;  7)  No visual or communicative limitations.  Dr. O'Brien noted, however, that plaintiff's pain and fatigue might also be considered.

C.   Hearing Testimony

At the March 10, 2008, hearing, Plaintiff testified that he is 56 years old, with a date of birth of September 28, 1951.  He is left handed, and lives with his mother.  He has an eleventh grade education, no GED or military experience.  During the years between 1990 and 1995, plaintiff did roofing work.  From 1998 through 2001, he did nursery work, general labor such as loading and unloading trucks.  He would lift upwards of about 75 pounds.  In 2005 and

2006, plaintiff worked as a day laborer for small hours, maybe four hours a day sometimes just one day per week as needed.  As a day laborer he would do general labor such as moving furniture, lifting from 50 to 75 pounds.  He did not work in either 2007 or 2008.

He testified that he can change the sheets on his bed, and he sometimes does his laundry.  His mom generally takes care of the house cleaning, while he takes care of the outdoors.  Plaintiff cooks meals once or twice a day.  He does grocery shopping weekly, or bi-weekly.  His grocery shopping takes maybe a half-hour to an hour.  He mainly shops by himself, but will sometimes take his mother.  Plaintiff mows the lawn with a regular power mower, not self-propelled.  However, he has to divide it up into three or four days, working no more than two hours a day.  The property is one and a half acres.  He used to be able to do it all in one, eight-hour day, but that was about ten years prior.  He mainly uses the mower for weed control, not a weed whacker.  He does rake leaves and branches into a burn pile, but does not chop wood.  He does not go to church, movies, fishing, camping, hunting, or engage in sports.  He owns a car, but has not changed the oil himself in a couple of years.  He is able to change the spark plugs in the car.  For exercise, he can go on walks for about 15 or 20 minutes, which he does maybe a couple times a month.  Plaintiff takes Vicodin for pain as needed.  He takes the Vicodin one or two days a week, sometimes five days a week.

Upon examination by his attorney at the hearing, plaintiff offered the following testimony.  He testified that he is a journeyman with the roofer's union.  He dropped his card last time around 1996 or 1997.  After he stopped being a journeyman roofer, he performed general labor.  He stated he is able to lift up to about 20 pounds; he can lift more than that, but not on a regular basis.

Plaintiff testified that his doctors have told him he has angioedema, hepatitis C, chronic arthritis in his whole body.  He was involved in a motorcycle accident in the early 1980s, wherein he broke his back and pelvic region, burst his bladder and had to have a blood transfusion.  He contracted the hepatitis C from the blood transfusion.  He was also involved in

two different accidents wherein he broke the bones in his foot and wrist, and shattered the lower part of his right leg.  He did not receive any physical therapy for those injuries.

He had surgery on his right arm for a ruptured tendon in 2004.  He also had surgery on the tendon in his right hand in about 2005.  He has less strength in his right hand and arm due to those surgeries, and he has not been able to work full-time since that injury.

The hepatitis C causes fatigue, problems with his legs filling up with blood.  He may also have fibromyalgia and angioedema from the hepatitis C breaking down his immune system.  He has pain from arthritis which effects his whole body, including his spine, neck, knees, and hips.  He is unable to get on his knees without extreme swelling, so he tries to stay off of them.  His knees also swell from walking or standing in one position too long.  It does not occur on a regular basis, but rather depends on what he does.  His pain is pretty steady, but increases with labor.

He was on ibuprofen for pain for a number of years, but his doctors determined that might be the cause of the angioedema.  He has been restricted to taking Tylenol with Vicodin, and avoiding aspirin.

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen,

1   879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or

2   if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is

3   conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where

4   the evidence is susceptible to more than one rational interpretation, one of which supports the

5   Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947,

6   954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in

7   weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

8                                                    **IV.  DISCUSSION**

9           Plaintiff argues the ALJ erred in three ways: (1) improper use of the "Grids[1]" due

10  to both exertional and non-exertional pain; (2) the ALJ failed to have a qualified vocational expert

11  testify; and (3) the ALJ improperly discounted plaintiff's credibility.

12          The essence of plaintiff's argument is that the ALJ improperly considered his

13  impairments at step three of the process (the listings), improperly discredited his pain testimony,

14  improperly evaluated the medical opinions, and his RFC was therefore incorrect resulting in an

15  improper use of the Grids and no vocational expert.

16          To achieve uniformity of decisions, the Commissioner has promulgated regulations

17  which contain, inter alia, a five-step sequential disability evaluation to determine whether a

18  claimant is physically and/or mentally disabled.  See 20 C.F.R. §§ 404.1520 (a)-(f) and

19  416.920(a)-(f).  If during any point of this review, it is determined that the claimant is not

20  disabled, the claim is not to be considered further.  See 20 C.F.R. §§ 404.1520(a) and 416.920(a).

21  The five-step process is summarized as follows:

22      1.      Determination of whether the claimant is engaged in substantial gainful activity,
                and if so engaged, the claimant is not presumed disabled and the analysis ends;

23

24      2.      If not engaged in substantial gainful activity, determination of whether the claimant
                has a severe impairment; if the claimant does not, the claimant is not presumed

25  _____

26          [1]     The Medical-Vocational Guidelines are commonly referred to as the "Grids."  See
        20 C.F.R., Part 404, Subpart P, Appendix 2.

disabled and the analysis ends;

3.    If the claimant has a severe impairment, determination of whether any such severe impairment meets any of the impairments listed in the regulations;[2] if the claimant does have such an impairment, the claimant is disabled and the analysis ends;[3]

4.    If the claimant's impairment is not listed, determination of whether the impairment prevents the claimant from performing his or her past work;[4] if the impairment does not, the claimant is not presumed disabled and the analysis ends; and

5.    If the impairment prevents the claimant from performing his or her past work, determination of whether the claimant can engage in other types of substantial gainful work that exist in the national economy;[5] if the claimant can, the claimant is not disabled and the analysis ends.

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. See 42 U.S.C. § 1382c(a)(3)(A).  A claimant must show that he or she has a physical or mental impairment of such severity that he or she is unable to do his or her previous work and cannot, considering his or her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See Quang Van Han v. Bower, 882 F.2d 1453, 1456 (9th Cir. 1989).

///

///

---

[2]    See 20 C.F.R. Pt. 404, Subpt. P, App. 1.

[3]    If a claimant is found to have an impairment which meets or equals one of the listed impairments, a conclusive presumption of disability applies and the claimant is entitled to benefits.  See Marcia v. Sullivan, 900 F.2d 172, 174  (9th Cir. 1990) (citing Williams v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987); Key  v. Heckler, 754 F.2d 1545, 1548 (9th Cir. 1985).

[4]    At this stage of the analysis, the ALJ should consider the demands of the claimant's past work as compared with his or her present capacity.  See Villa v. Heckler, 797 F.2d 794, 797 (9th Cir. 1986) (citations omitted); 20 C.F.R. § 416.945(a).

[5]    At this stage of the analysis, the ALJ should consider the claimant's residual functional capacity and vocational factors such as age, education and past work experience.  See 20 C.F.R. §§ 404.1520(f) and 416.920(f).

The claimant has the initial burden of proving the existence of a disability within the meaning of the Act.  See Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).  The claimant establishes a prima facie case of disability by showing that a physical or mental impairment prevents him from engaging in his previous occupation (steps 1 through 4 noted above).  See Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f).  However, once the claimant establishes a prima facie case of disability, the burden of going forward with the evidence shifts to the Commissioner.  See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986);  see Hammock v. Bowen, 867 F.2d 1209, 1212-1213 (9th Cir. 1989).  The Commissioner has the burden to establish the existence of alternative jobs available to the claimant, given his or her age, education, and medical-vocational background (step 5 noted above).  In an appropriate case, the Secretary may meet this burden through application of the medical-vocational guidelines set forth in the regulations.[6]  See 20 C.F.R. Pt. 404, Subpt. P, App. 2; Heckler v. Campbell, 461 U.S. 458 (1983); Olde v. Heckler, 707 F.2d 439, 440 (9th Cir. 1983).  If the guidelines do not accurately describe a claimant's limitations, the Commissioner may not rely on them alone to show availability of jobs for the claimant.  See Desrosiers v. Secretary, 846 F.2d 573, 577 (9th Cir. 1988).[7]

/ / /

----

[6]   For any given combination of factors (residual functional capacity, age, education, and work experience), the guidelines direct a conclusion of disability or nondisability when they accurately describe a claimant's particular limitations.

[7]   However, the mere allegation of the presence of a non-exertional impairment is not sufficient to preclude application of guidelines.  Such non-exertional impairment must be found to significantly limit the range of work permitted by a claimant's exertional limitations before the Commissioner will be required to obtain expert vocational testimony regarding the availability of other work.  See, e.g., Polny v. Bowen,  864 F.2d 661, 663 (9th Cir. 1988); Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); Razey v. Heckler, 785 F.2d 1426, 1430 (9th Cir. 1986) (modified 794 F.2d 1348 (1986)); Perminter v. Heckler, 765 F.2d 870, 872 (9th Cir. 1985).  Pain has been recognized as a non-exertional limitation which can significantly limit ability to perform basic work skills.  See Perminter v. Heckler, 765 F.2d 870, 872 (9th Cir. 1985).

1    **A.    LISTING (STEP 3)**

2         The Social Security Regulations "Listing of Impairments" is comprised of

3    impairments to fifteen categories of body systems that are severe enough to preclude a person

4    from performing gainful activity.  See Young v. Sullivan, 911 F.2d 180, 183-84 (9th Cir. 1990);

5    20 C.F.R. § 404.1520(d).  Conditions described in the listings are considered so severe that they

6    are irrebuttably presumed disabling.  20 C.F.R. § 404.1520(d).  In meeting or equaling a listing,

7    all the requirements of that listing must be met.  See Key v. Heckler, 754 F.2d 1545, 1550 (9th

8    Cir. 1985).

9         Here, plaintiff argues the ALJ erred in failing to find that three of his impairments

10   met the listing requirements.  Plaintiff argues that he meets the listing impairment requirements of

11   1.02B, 1.04C, and 5.05F.  Listing impairments 1.02B and 1.04C are both musculoskeletal

12   impairments: 1.02B is a major dysfunction of a joint,  while 1.04C is a disorder of the spine.

13   Listing impairment 5.05F is chronic liver disease, specifically hepatic encephalopathy.  However,

14   plaintiff fails to specify how he meets these listing impairments.

15        At step three, the ALJ found

16        The claimant's musculoskeletal impairment has not resulted in
          motor loss, reflex changes, neurological deficits or the degree of
17        functional loss required by the musculoskeletal listings.  The
          claimant's angioedema is intermittent and controllable by avoiding
18        allergens and using proper medication.  (CAR 24).

19        "To *meet* a listed impairment, a claimant must establish that he or she meets each

20   characteristic of a listed impairment relevant to his or her claim.  To *equal* a listed impairment, a

21   claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and

22   duration' to the characteristics of a relevant listed impairment . . . ."  Tackett v. Apfel, 180 F.3d

23   1094, 1099 (9th Cir., 1999).

24        Listed impairment 1.02 requires gross deformity and chronic joint pain with "B.

25   Involvement of one major peripheral joint in each upper extremity . . . resulting in inability to

26   perform fine and gross movements effectively, as defined in 1.00B2b."  20 CFR Pt. 404 Subpt. P,

1   App. 1.  Inability to perform fine and gross movements, as defined at 1.00B2b,

2              means an extreme loss of function of both upper extremities; *i.e.*, an
            impairment(s) that interferes very seriously with the individual's
3           ability to independently initiate, sustain, or complete activities.  To
            use their upper extremities effectively, individuals must be capable
4           of sustaining such functions as reaching, pushing, pulling, grasping,
            and fingering to be able to carry out activities of daily living.
5           Therefore, examples of inability to perform fine and gross
            movements effectively include, but are not limited to, the inability
6           to prepare a simple meal and feed oneself, the inability to take care
            of personal hygiene, the inability to sort and handle papers or files,
7           and the inability to place files in a file cabinet at or above waist
            level.

8   Id.

9       Listed impairment 1.04 requires "compromise of a nerve root . . . or the spinal

10  cord.  With:  . . . C. Lumbar spinal stenosis resulting in pseudoclaudication, established by

11  findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain

12  and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b."  Id.

13  Inability to ambulate effectively is defined as "an extreme limitation of the ability to walk; *i.e.*, an

14  impairment(s) that interferes very seriously with the individual's ability to independently initiate,

15  sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient

16  lower extremity functioning . . . to permit independent ambulation without the use of a hand-held

17  assistive device(s) that limits the functioning of both upper extremities."  Id.

18      Plaintiff relies on his complaints of chronic pain resulting from his injuries, a

19  nerve conduction study performed on June 30, 1997, an August 4, 2000, x-ray by Dr. Cerny, and

20  his 2006 right hand injury which required surgery, to support this claim.  However, none of these

21  medical records support his claim that his condition meets the listing requirements set forth above.

22  There is no evidence in the record that he was unable to use his upper arms to perform fine and/or

23  gross manipulations to the extent he was unable to take care of himself or handle papers and files.

24  In fact, plaintiff testified he helps with the household chores, including yard work, is able to go

25  grocery shopping independently and can walk for 15 to 20 minutes.  Therefore, while plaintiff

26  may have pain associated with his various injuries and ailments, the pain and injuries he sustained

13

1  have not resulted in the inability to use his upper extremities or ambulate independently.  Thus, he

2  has not show that he meets the listing requirements.

3          Similarly, listed impairment 1.05F is chronic liver disease, with:

4          Hepatic encephalopathy as described in 5.00D10, with 1 and either
           2 or 3: 1.  Documentation of abnormal behavior, cognitive
5          dysfunction, changes in mental status, or altered state of
           consciousness . . . ; and 2.  History of transjugular intrahepatic
6          portosystemic shunt (TIPS) or any surgical portosystemic shunt; or
           3. One of the following occurring on at least two evaluation at least
7          60 days apart within the same consecutive 6-month period as in F1:
           a. Asterixis or other fluctuating physical neurological
8          abnormalities; or  b. Electroencephalogram (EEG) demonstrating
           triphasic slow wave activity; or c. Serum albumin of 3.0 g/dL or
9          less; or d.  International Normalized Ration (INR) of 1.5 or granter.
   Id.

10         Plaintiff relies on his diagnosis of Hepatitis C and his complaints of fatigue,

11  abdominal pain and muscle weakness to support his argument that he meets these listing

12  requirements.  However, nothing in the record support such a finding.  There is no indication that

13  Plaintiff has ever suffered abnormal behavior, cognitive dysfunction, changes in his mental status

14  or an altered state of consciousness as set forth in 5.05F1.  In addition, although he has been

15  diagnosed with hepatitis C, he has never sought treatment therefor.  Thus, he has not shown that

16  he meets the listing requirements or that the ALJ erred in his findings.

17          **B.    PLAINTIFF'S CREDIBILITY**

18          The Commissioner determines whether a disability applicant is credible, and the

19  court defers to the Commissioner's discretion if the Commissioner used the proper process and

20  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

21  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

22  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

23  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

24  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

25  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

26  credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

1  1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and

2  Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

3        If there is objective medical evidence of an underlying impairment, the

4  Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

5  because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

6  341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

7          The claimant need not produce objective medical evidence of the
   [symptom] itself, or the severity thereof.  Nor must the claimant produce
8          objective medical evidence of the causal relationship between the medically
   determinable impairment and the symptom.  By requiring that the medical
9          impairment "could reasonably be expected to produce" pain or another
   symptom, the Cotton test requires only that the causal relationship be a
10         reasonable inference, not a medically proven phenomenon.

11 80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799 F.2d

12 1403 (9th Cir. 1986)).

13       The Commissioner may, however, consider the nature of the symptoms alleged,

14 including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

15 947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

16 claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

17 testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

18 prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

19 physician and third-party testimony about the nature, severity, and effect of symptoms.  See

20 Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

21 claimant cooperated during physical examinations or provided conflicting statements concerning

22 drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

23 claimant testifies as to symptoms greater than would normally be produced by a given

24 impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

25 Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

26 / / /

1      Here, the ALJ found:

2      After considering the evidence of record, the undersigned finds that
       the claimant's medically determinable impairments could
3      reasonably be expected to produce the alleged symptoms; however,
       the claimant's statements concerning the intensity, persistence and
4      limiting effects of these symptoms are not credible to the extent
       they are inconsistent with the residual functional capacity
5      assessment for the reasons explained below.  (CAR 25)
       . . .
6
       The claimant has alleged that he has severe chronic pain, weakness,
7      and fatigue.  He has stated that he cannot sit, stand, or walk very
       long.  He said he cannot do strenuous work, and even has pain
8      without doing strenuous activity.  However, his allegations
       regarding the degree of his symptoms and functional limitations are
9      not credible for the following reasons.  The claimant has primarily
       had only brief intermittent treatment for various acute injuries or
10     illnesses that did not last or would not be expected to last 12 months
       or more.  His various treatments such as surgery and medication
11     have been effective.  There is no evidence to support his allegations
       of ongoing severe neck, shoulder, arm and overall body pain.  He
12     has occasionally sought treatment for back pain, but this is treated
       with Vicodin.  The clinical findings do not show weakness, atrophy,
13     or neurological changes.  Other than his successful surgeries, his
       treatment has been minimal, intermittent, and conservative.
14     Although evidence in the record shows that he has chronic
       obstructive pulmonary disease, this was essentially an incidental
15     finding.  The record does not show complaints of shortness of
       breath related to this.  Activities of daily living show that he can do
16     some household chores, mow the yard, do some shopping, cook,
       drive, and occasionally work part time, even at relatively laborious
17     tasks.  It is also noted that Dr. O'Brien's report shows that the
       claimant had two positive Waddell's signs suggesting possible
18     exaggeration of symptoms.  (CAR 27-28).

19     Plaintiff argues the ALJ failed to provide sufficient reason for finding him not

20  credible.  He states the ALJ's reliance on the consultative examination fails to support the

21  credibility finding as Dr. O'Brien examination and statements support his limitations and does not

22  account for his pain and fatigue.  In addition, as there was no finding of malingering, the ALJ was

23  required to set forth clear and convincing reasons to find him not credible, which the ALJ failed to

24  do.  Plaintiff had good reason for his limited medical treatment:  he was indigent and uninsured so

25  had limited access to medical care.  However, he routinely sought medical treatment for his

26  injuries and maintained his recommended pain management regimen.

16

1          In response, defendant argues there was in fact evidence of symptom magnification

2   suggesting malingering in Dr. O'Brien's finding of two positive Waddell's signs.  Thus, the ALJ

3   did not need to make an affirmative finding.  Nevertheless, the ALJ provided sufficient reasoning

4   for finding plaintiff not credible.  The ALJ found plaintiff had brief, intermittent treatment, his

5   various treatments were effective, there was a lack of evidence to support his allegations of pain

6   or weakness, his treatment was conservative, and his activities of daily living do not support his

7   claims.  According to defendant, these reasons are sufficient for not crediting plaintiff's

8   testimony.

9          Plaintiff responds that it was not appropriate for the ALJ to use his intermittent

10  medical treatment as evidence of his credibility.  Rather, the ALJ should have taken into

11  consideration such things as his lack of access, and limited income.  He also argues that his claims

12  of pain are supported by clinical findings, and the treatments (including his surgeries) have only

13  had a moderate to limited effect on his disabilities.

14          As stated above, the ALJ may take several things into consideration when

15  determining a plaintiff's credibility.  These include the plaintiff's reputation, inconsistent

16  statements, unexplained failure to seek or follow prescribed treatment, the daily activities, work

17  records, and other testimony as to the severity and effect of plaintiff's symptoms.  Here, the ALJ

18  took into account plaintiff's testimony as to his abilities, his brief intermittent treatment, that his

19  treatments have been effective, the lack of evidence to support his allegations of pain including

20  limited treatment therefor, lack of supporting clinical findings, conservative treatment other than

21  the successful surgeries, his activities of daily living, and Dr. O'Brien's report suggesting a

22  possible exaggeration of symptoms.  While plaintiff's argument in regards to his limited medical

23  treatment is well received, that was only one of the reasons the ALJ provided.  He may not have

24  had access or ability to seek treatment, but the treatment he did receive was conservative.  For

25  instance, the pain medication he was prescribed for many years was Tylenol and/or ibuprofen.

26  Only following an allergic reaction to the ibuprofen, was he prescribed Vicodin.  In addition,

17

when he did seek treatment, such as for his chronic sinus issues, he did not also complain about and seek treatment for his other ailments.  In addition, the ALJ found plaintiff's surgeries were relatively, if not completely, successful.  This finding is supported by the record in that there are no notations where plaintiff raised the issue of continued difficulties with his arm and/or hand following the surgeries.  In addition, plaintiff testified that he was able to manage fairly well on his own, including participating in housekeeping, yard work, shopping, etc.  The reasons the ALJ provided for determining plaintiff's credibility were clear and convincing, and supported by the record as a whole.

### C.   MEDICAL OPINIONS

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  See id. at 831.  In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

Plaintiff argues the ALJ improperly relied on the opinion of the CE, Dr. O'Brien, as the opinion was rendered six months before his hand injury, describes plaintiff as a reliable historian, and his statements to the CE are consistent with his other statements in the record.  Plaintiff further argues that the ALJ apparently relied solely on the CE without any consideration of the rest of the medical record.

Defendant counters this argument stating that the ALJ did not err in his reliance on the CE's opinion, because there were no other medical opinions in the record.  In addition, the ALJ found plaintiff was more limited than the CE opined, and the injury to his right hand would have a minimal impact because plaintiff is left-hand dominate.

The ALJ reviewed the medical records in the file through the date of application. He noted:

> The record contains a note from Robert Allen, M.D. dated May 19, 2004.  He stated that on March 15, 2004, the claimant had undergone surgical repair on a ruptured right biceps tendon resulting from an injury on December 19, 2003.  Dr. Allen stated that the claimant would need until January 15, 2005 for proper rehabilitation.  He did not expect the claimant to perform gainful employment as a laborer until after that time (Exhibits 3F, 5F).

19

> Despite these findings prior to the alleged onset date, the claimant
> returned to heavy work in September 2004, and even performed
> some heavy work afterwards, although not at substantial gainful
> activity levels.  In addition, the claimant was receiving no treatment
> at the time that he filed his application.  Thus, a consultative
> examination was required (Exhibits 1E, 2E).

(CAR at 26).

The ALJ then noted plaintiff's October 11, 2006, hand injury which required surgery and physical therapy.  The ALJ stated that "Disability Determination Service concluded that these impairments would not last 12 months and that the claimant's conditions were not severe (Exhibits 4F, 5E)." (CAR 27).  He then noted plaintiff's angioedema, which was likely caused from ibuprofen that had been discontinued.

The ALJ ordered the consultative examination due to the lack of treatment plaintiff was receiving.  Plaintiff's argument that the ALJ relied on the CE without consideration of the medical record thereafter is contradicted by the record.  As set forth stated above, the ALJ noted plaintiff's hand injury and surgery.  However, it was determined that this injury would not last 12 months.  A review of the medical records after October 2006 show that plaintiff was seen for intestinal pain, angioedema, back and neck pain, and inflamation of the legs.  In May 2007, plaintiff was seen by Dr. Ralik where he complained of chronic back pain, DJD, hepatitis C, asthma, and chronic sinusitis.  His range of motion in the lumbar spine was somewhat decreased with flexion and extension because of pain, and he had minimal tenderness in the upper and lower spinal region.  He was offered a prescription for Vicodin, but refused to sign a pain management contract and a baseline urine drug test. (CAR 257).  However, in November 2007, plaintiff was counseled to stop all nonsteroidal anti-inflammatory drugs, and was given Tylenol and Vicodin.  There are no specific opinions by any treating physician, nor is there any record of plaintiff complaining about use of or pain in his hand.

Thus, the undersigned finds no error in the ALJ's treatment of the medical opinions.  There were no conflicting opinions, but rather a lack of treatment records and opinions which the ALJ resolved by ordering a consultative examination.  Reliance on the CE was not

1    erroneous, and the ALJ did not improperly ignore the treatment records from after the consultative

2    examination.

3              **D.    RESIDUAL FUNCTIONAL CAPACITY**

4              Residual functional capacity is what a person "can still do despite [the

5    individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

6    Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current

7    "physical and mental capabilities").   In determining residual functional capacity, the ALJ must

8    assess what the plaintiff can still do in light of both physical and mental limitations.  See 20

9    C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751 F.2d 1082, 1085 (9th

10   Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities").

11             Plaintiff argues the ALJ erred in the determination of his RFC as well as his use of

12   the Grids instead of calling a vocational expert to testify at the hearing.  First, he argues that the

13   use of the Grids was inappropriate due to his exertional and non-exertional pain.  Second, he

14   argues the ALJ erred in failing to call a vocational expert to testify at the hearing as to the

15   availability of jobs given his exertional and non-exertional limitations.

16             The Grids provide a uniform conclusion about disability for various combinations

17   of age, education, previous work experience, and residual functional capacity.  The Grids allow

18   the Commissioner to streamline the administrative process and encourage uniform treatment of

19   claims based on the number of jobs in the national economy for any given category of residual

20   functioning capacity.  See Heckler v. Campbell, 461 U.S. 458, 460-62 (1983) (discussing creation

21   and purpose of the Grids).

22             The Commissioner may apply the Grids in lieu of taking the testimony of a

23   vocational expert only when the Grids accurately and completely describe the claimant's abilities

24   and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

25   Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

26   Grids if a claimant suffers from non-exertional limitations because the Grids are based on

exertional strength factors only.[8]  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).

"If a claimant has an impairment that limits his or her ability to work without directly affecting his

or her strength, the claimant is said to have non-exertional . . . limitations that are not covered by

the Grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

even when a claimant has combined exertional and non-exertional limitations, if non-exertional

limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d

1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

        In cases where the Grids are not fully applicable, the ALJ may meet his burden

under step five of the sequential analysis by propounding to a vocational expert hypothetical

questions based on medical assumptions, supported by substantial evidence, that reflect all the

plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

1341 (9th Cir. 1988).

/ / /

---

[8]        Exertional capabilities are the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  See 20 C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§ 404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  See 20 C.F.R. §§ 404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  See 20 C.F.R. §§ 404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  See 20 C.F.R. §§ 404.1567(e) and 416.967(e).
        Non-exertional activities include mental, sensory, postural, manipulative, and environmental matters which do not directly affect the primary strength activities.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(e).

Here, as set forth above, the ALJ found Plaintiff had the residual functional capacity to perform the full range of medium work, which involves lifting no more than 50 pounds occasionally or 25 pounds frequently.  The ALJ did not find any limitations, exertional or non-exertional, due to plaintiff's pain complaints.  This finding is based on the ALJ's determination that plaintiff's "allegations regarding the degree of his symptoms and functional limitations are not credible . . . ."  As addressed above, the undersigned has determined that the ALJ gave clear and convincing reasons for this credibility determination, which were supported by the record as a whole.  Thus, there was no error in the credibility determination, and the ALJ therefore did not err in determining plaintiff's RFC which had no non-exertional limitations.  As the ALJ determined no non-exertional limitations were present, reliance on the Grids was similarly not erroneous.

Plaintiff fails to specify what non-exertional limitations he has which render the Grids ineffectual.  While he argues he has exertional and non-exertional pain, he fails to explain how that pain limits his abilities.  The ALJ found that while he had sought treatment for back pain, the pain was being treated with Vicodin.  While pain can be a non-exertional limitation, "the fact that a non-exertional limitation is alleged does not automatically preclude application of the grids."  Tackett v. Apfel, 180 F.3d 1094, 1102 (9th Cir. 1999).  Plaintiff does not point to any portion of the record to show that the pain treatment was ineffectual or to support his contention that he was limited in his abilities due to the pain.  In fact, he testified that he was able to lift up to 20 pounds, and even more occasionally.  The use of a VE is only required where the Grids fail to accurately and completely describe the claimant's abilities and limitations.  Here, the ALJ found plaintiff only had exertional limitations, which were met by the Grids.  This determination was supported by the record as a whole.  As there were no significant non-exertional limitations, it was not erroneous to rely on the Grids instead of the testimony of a vocational expert.

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**V.  CONCLUSION**

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

      1.     Plaintiff's motion for summary judgment (Doc. 15) is denied;

      2.     Defendant's cross-motion for summary judgment (Doc. 18) is granted; and

      3.     The Clerk of the Court is directed to enter judgment and close this file.

DATED:  January 26, 2011

                                         _____
                                        **CRAIG M. KELLISON**
                                        UNITED STATES MAGISTRATE JUDGE